T.C. Memo. 2007-182

UNITED STATES TAX COURT

ESTATE OF KIMBERLY A. HICKS, Deceased, KEY TRUST
COMPANY OF OHIO, N.A., Administrator, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 13779-02.                    Filed July 10, 2007.

<u>Timothy G. Crowley</u>, for petitioner.

<u>Robert D. Kaiser</u>, for respondent.

MEMORANDUM OPINION

HOLMES, <u>Judge</u>:  Kimberly Hicks, while still a toddler, was
severely disabled in a collision at a railroad crossing.
Litigation followed, and the largest part of the ultimate
settlement was a lump sum to be allocated between Kimberly and
her father.  The Ohio court that allocated that lump sum gave

over $1.4 million to her father, but with the full expectation that he would immediately lend $1 million to a special trust for Kimberly's benefit. Kimberly died before she needed the money, and the major question presented in this case is whether the $1 million is deductible from the taxable value of her estate as a debt incurred on a *bona fide* loan.

### Background

Kimberly Hicks was born on July 1, 1987. She lived with her parents, Clyde and Theresa, who were both guards at an Ohio women's prison. In April 1990, her mother was driving the family minivan when it collided with a Conrail locomotive engine, and then with a car driven by a man named Swank. The accident left Kimberly a quadriplegic, dependent on a ventilator to breathe, and in need of constant medical attention for the rest of her life. Theresa Hicks and her other daughter both suffered only minor injuries.

The Hickses hired a lawyer, and the Probate Court for Union County (the county in central Ohio where the Hickses lived at the time of the accident and when the petition was filed) appointed Society National Bank as guardian for the estates of both

Kimberly and her sister.[1]  As guardian of the estates, Society National sued Conrail and threatened to sue Swank.

Swank settled first, in September 1991, for $100,000.  The Probate Court approved the allocation of this recovery among unpaid attorneys' fees and expenses, compensation to Kimberly's parents for loss of consortium,[2] and compensation to Kimberly for her injuries.

Next to settle, in April 1993, was the Hickses' own car insurance carrier with whom they had filed a claim.  This claim was also settled for $100,000.  The probate court again approved the settlement, but this time authorized Society National to use the full amount for litigation expenses against Conrail.

This left Conrail, which faced the largest liability, fighting hard to avoid it.  The Hickses and Society National's suit against Conrail sought damages for medical expenses, pain and suffering, and Clyde's loss of consortium from Kimberly.

---

[1] Ohio family law distinguishes guardians with "custody and maintenance" from guardians of an "estate".  A guardian with custody and maintenance has such duties as protecting his ward, providing her an adequate education if she is a minor, and supervising her medical care.  Ohio Rev. Code Ann. sec. 2111.13 (LexisNexis Supp. 2007).  The guardian of an estate has the legal duty to manage the estate for the ward's best interest subject to court supervision.  Ohio Rev. Code Ann. sec. 2111.14 (Anderson 2002).

[2] Ohio courts recognize parents' right to recover damages for physical injury to their minor child, terming such claims "loss of filial consortium."  "Consortium" includes "services, society, companionship, comfort, love and solace."  Gallimore v. Children's Hosp. Med. Ctr., 617 N.E.2d 1052, 1054 (Ohio 1993).

Conrail counterclaimed against Theresa, and she then counterclaimed against Conrail. Spurring the litigation from Clyde and Theresa's perspective were several problems that they faced. First, they needed enough money to meet their moral (and statutory) duty to provide for the ordinary expenses of their minor children.[3] Clyde had been specially recognized by the Probate Court as Kimberly's guardian for "custody and maintenance," and so had a specific duty in that capacity to provide suitable maintenance for her care.[4] According to the entirely credible testimony of Theresa Hicks, Kimberly's physical injuries had not damaged her mind, and as she grew to school age she was able, within the limits of her paralysis, to be as lively a little girl as her friends. The estimates of her expected lifespan after the accident varied widely, but one prepared by an insurance company at the request of the Hickses' lawyer suggested it was quite likely that she would live into adulthood. This meant that Clyde's guardianship (and its related duties) would also likely last until she reached the age of majority.

This raised a second problem. Kimberly obviously faced heavy medical expenses. At the time of the accident, the Hickses

---

[3] Section 3103.03(A) of the Ohio Code states: "The biological or adoptive parent of a minor child must support the parent's minor children out of the parent's property or by the parent's labor." Ohio Rev. Code Ann. sec. 3103.03(A) (Anderson 2003).

[4] Ohio Rev. Code Ann. sec. 2111.13(A) (2007).

had very good health insurance through their local Blue Cross/Blue Shield. It was paying for almost all of Kimberly's extraordinary medical expenses, and it had no lifetime cap, but the policy would continue only as long as either Clyde or Theresa remained employed by the State. They recognized that they might lose their coverage--by having to leave their jobs at the prison, by the State's choosing to switch insurers, or by the insurer's changing the terms of the policy. More haunting was the possibility that one or both of them might not survive their daughter--Clyde in particular was of an age and had physical problems of his own that made that fear reasonable. So the Hickses were rightly worried about all the future costs of caring for a very disabled child.

These worries made it very important that Kimberly be in a position to qualify for Medicaid when she became an adult or if the Hickses lost their insurance. Qualifying for Medicaid would mean that Kimberly would get the care she needed, but Medicaid is a program designed for the poor and its eligibility rules would force her to spend down any damages she won. And, though Medicaid provides adequate care, the Hickses reasonably thought it would be less than perfect in meeting Kimberly's special needs.

The Hickses' ability to solve these problems and allay their worries was very uncertain. Conrail disputed its liability,

blaming Theresa for the accident, and the Hickses' medical insurer intervened to protect its subrogation rights. Conrail even won summary judgment before trial, though the Hickses got that reversed on appeal. This pretrial maneuvering looked like it was headed to another round of appellate review, as both the Hickses and Conrail had petitioned the Ohio Supreme Court to take the case. But then, in early 1994, Conrail offered to settle all claims for $4,650,000. It had already negotiated separate settlement of Blue Cross/Blue Shield's subrogation claim, which relieved the Hickses from having to split the proposed settlement with their insurer. But Conrail's offer was a lump sum in exchange for a release--there is nothing in the record that shows Conrail cared at all about how that lump sum would be split among the Hickses or their various causes of action.

This is where the Hickses' lawyers showed considerable professionalism--instead of just taking a lump sum or negotiating an ordinary structured settlement, they brought in a team of specialists, one of whom was Thomas Baxter. Baxter is an attorney with a practice at the intersection of health care, trust, and probate law. He focuses on the analysis and creation of trusts for the benefit of severely disabled adult children whose parents need help in navigating the complex and frequently

changing rules governing eligibility for Medicaid.  Baxter suggested to the Hickses that they create two trusts for Kimberly.

The first was the Kimberly Hicks Special Needs Trust. Baxter designed the Special Needs Trust to comply with section 1396p(d)(4)(A) of the Medicaid Payback Trust Act, which had just been enacted in 1993.  42 U.S.C. sec. 1396p(d)(4)(A) (2007). Beneficiaries of trusts that comply with the Act's provisions need not exhaust trust assets to qualify for Medicaid or other government assistance, since the assets of this kind of trust don't count in determining eligibility for Medicaid.  When the beneficiary dies, however, the State gets back from the trust whatever it paid for medical care on her behalf.  Id.  Kimberly's Special Needs Trust would pay expenses uncovered by government assistance or her health insurance.  It was to be funded with $1 million from the Conrail settlement.

The second trust was the Kimberly Hicks Settlement Fund Management Trust, and was to be available to Kimberly for her "support, maintenance, health and education."  This trust was to be funded in part by another $450,000 from the Conrail settlement.[5]  This trust's assets, however, would be counted in

---

[5] The Management Trust agreement recited that the settlors of the Trust were Clyde and Theresa, even though all the other documents in the record showed it funded from another $450,000 of the Conrail settlement to be allocated to Kimberly.  The parties
(continued...)

determining Kimberly's Medicaid eligibility. This meant that if the insurance coverage she had through her parents lapsed, she would have to spend all or nearly all of the Management Trust's assets. The Hickses' attorneys came up with the apparently novel (or at least untried in any reported decision that we could find) idea of having Clyde fund a substantial part of this trust with a loan of $1 million to be allocated to him from the settlement. The loan would be evidenced by a promissory note from the Management Trust to him and would pay interest at 6% *per annum*, slightly less than Society National expected to earn from investing the Management Trust's corpus. The note was not amortizing, and was callable on demand in only two circumstances --Kimberly's death or her failure "to have available at reasonable premium charges a commercial medical indemnity contract" once she turned eighteen.

The Hickses and their lawyers did not have the final say about this. Local probate courts have jurisdiction under Ohio law to review and approve the settlement, allocation, and distribution of noneconomic compensatory damages in civil cases.

---

[5](...continued)
did not discuss how it was that Kimberly's parents could be regarded as ever having possession of this $450,000. If this initial corpus came from Kimberly herself, it is conceivable that it might have counted as her own asset for purpose of Medicaid eligibility. See 42 U.S.C. 1396p(d). On the estate tax return, this original corpus was listed as estate property. See <u>infra</u>, p.10.

See Ohio Rev. Code Ann. sec. 2111.18 (Anderson 2002).  With their

tentative settlement in hand, the Hickses petitioned the Union

County Probate Court to approve their plan.  Baxter sent a

prehearing report to the judge to explain the proposed trusts and

loan.  He carefully noted:

> The $1 million loan which Mr. Hicks is making
> to the Settlement Trust, although available
> for Kimberly's use and benefit during her
> lifetime, will not be an asset of her estate
> at her death.  Since her estate will probably
> exceed $600,000, the savings on the $1
> million which will not be included will be
> approximately $500,000.

The Probate Court reviewed the plan at a hearing in June

1994 and approved both the amount of the settlement and

attorneys' fees, and the creation of the trusts.  Society

National drew up a plan to distribute the funds, which the Court

approved about a month later.  The plan allocated $1,415,000 to

Clyde Hicks for loss of services and loss of consortium;

$1,450,000 to Kimberly; and $100,000 to Theresa and Kimberly's

sister for their comparatively minor injuries.  (The remainder

went to attorneys' fees and expenses.)  Society National, in its

capacity as trustee of the Management Trust, issued a promissory

note to Clyde for $1 million.  This had been contemplated by the

terms of the Management Trust, under which proceeds from such a

loan "shall become part of the trust property and shall be

administered and distributed on the same terms as the property

originally contributed to the trust."  With the trusts in place,

the Probate Court was able to terminate Society National's role as guardian of Kimberly's estate--a financial benefit to the estate because, under Ohio law, the fees and expenses of a guardianship are noticeably greater than those of a trust.

For several years, the trusts and loan worked as planned. Clyde received interest on schedule, and duly reported it on his income tax return each year. But then, in December 1998, Kimberly died. She was only eleven years old, and her estate needed no probate because her only assets were the property held in the two trusts. Society National's successor--the Key Trust Company (which has its principal place of business in Ohio)-- became the administrator of her estate, and filed an estate tax return in September 1999. The estate listed the total amounts in both trusts--including the assets bought with the contested $1 million--under the Code provisions that regard certain trust assets to be part of a decedent's estate. See secs. 2036, 2037, and 2038.[6] It then claimed as a deductible debt under section 2053(a)(3) and (4) the $1 million owed to Clyde under the promissory note. The estate also took other deductions, but mutual concessions reduced the issues that we must decide to only two: (1) Is the estate entitled to deduct $1 million as a

---

[6] Unless otherwise indicated, all section references are to the Internal Revenue Code, and the Rule references are to the Tax Court Rules of Practice and Procedure.

repayment of a loan; and (2) is it entitled to deduct more than $170,000 in administrative and legal expenses?

Discussion

I.  Loan Treatment

The main issue in this case is how to treat the $1 million promissory note issued to Clyde by the Management Trust.  The estate urges us to accept the transaction as what the Hickses and their lawyers designed it to be--a loan by Clyde of $1 million from his share of the Conrail settlement.  The Commissioner argues that this "loan" was hardly *bona fide* and, even it were, urges us to apply the substance-over-form doctrine and disregard it as a sham.

We begin with the Code.  Section 2053(c)(1)(A) allows a deduction from the value of an estate for any indebtedness, but only "to the extent that [it was] contracted *bona fide and for an adequate and full consideration in money or money's worth * * *."* (Emphasis added.)  The regulation directs us to apply State law in deciding whether a debt is "payable out of property subject to claims and * * * allowable by the law of the jurisdiction * * *." Sec. 20.2053-1(a)(1), Estate Tax Regs; see also Estate of Lazar v. Commissioner, 58 T.C. 543, 552 (1972).  The Commissioner's first attack on the *bona fides* of the loan is an argument that Clyde never had control over the $1 million to begin with.  He claims that the settlement really provided Clyde with only

$415,000 in damages, and that the probate judge's allocation of damages effectively transferred the $1 million straight from the guardian's interim financial holding account to the Management Trust without Clyde's ever having control.

We think the Commissioner is underestimating the importance of the Probate Court in deciding to whom the $1 million belonged. The Hickses' lawyers were very careful in leaving the unallocated settlement funds with Society National until the beneficiaries were determined. This acknowledged the Probate Court's broad discretionary authority as "superior guardian" of a minor under Ohio law. That status means that the Probate Court has the power and authority to control the actions of the minor's guardian and act directly to ensure that the minor's best interests are being considered. Ohio Rev. Code Ann. sec. 2111.50 (Anderson 2002). It also means that the Probate Court has to approve any settlement which the minor's guardian reaches before it can take effect. See Ohio Rev. Code Ann. sec. 2111.18 (2007). Because of this essential role the Probate Court plays under Ohio law, we hold that the $1 million in question didn't belong to anyone until the Probate Court said it did.

The Commissioner's attack doesn't end with that quibble about possession of the settlement proceeds under Ohio law. He also argues that the allocation was a sham. This is itself a problem because the statute and regulation don't tell us to

review the allocation. They tell us to review the *bona fides* of the loan. Decades ago, we held that the "bona fides of a loan are primarily established by the intention of the parties that repayment will be made pursuant to the terms of the agreement." Estate of Ribblesdale v. Commissioner, T.C. Memo. 1964-177. The Commissioner isn't really contesting the existence of that intention--it is uncontroverted that Kimberly's trust was paying interest to Clyde. We also specifically find that all the parties to the trust arrangement intended that the loan would be repaid if either of the stated conditions--Kimberly's death or need to get on Medicaid--were met. In Estate of Labombarde v. Commissioner, 58 T.C. 745, 753 (1972), affd. 502 F.2d 1158 (1st Cir. 1973), we held that the children's support payments to their mother were not a loan because there was no note evidencing the supposed debt and no interest was ever paid. Here, the facts are in complete contrast: The note was executed and admitted into the record, and Clyde was paid interest every month on the principal amount of the loan.

The Commissioner does make a good point by noting that the Probate Court specifically mentioned at the settlement hearing only $415,000 as compensation to Clyde. He concludes from this that the extra $1 million allocated to Clyde in the papers approved by the Probate Court transformed the allocation into nothing more than an "uncontested, nonadversarial, and entirely

tax-motivated" proceeding of the sort we condemned in <u>Robinson v.</u> <u>Commissioner</u>, 102 T.C. 116, 129 (1994), affd. in part and revd. in part 70 F.3d 34 (5th Cir. 1995). In the Commissioner's view, the Probate Court's review is colored by the undisputed fact the Hickses themselves proposed the allocations, and Kimberly and her father did not have adverse interests in how the settlement proceeds were distributed. The Commissioner reasonably suspects that this might mean the form of the allocations has little relation to economic reality, and that the disputed $1 million was Kimberly's at all times.

We disagree at the outset with the Commissioner's unlinking of the $1 million repayment feature of the loan from its associated income stream. That income stream was Clyde's from the start, and it is plain error as a matter of economics to say in effect that it was valueless. Because the note was callable at Kimberly's death, we can estimate its present value as of the Probate Court's allocation by using her life expectancy at that time. That was the subject of considerable dispute, and the Commissioner argues that it ranged between 4 and 50 years. The annual payment to Clyde was fixed at $60,000. If one uses a discount rate of 10% to this income stream (at the time, long-

term prime interest rates were between 7% and 8%),[7] and applies it to the range of Kimberly's life expectancy, Clyde's income interest in the note was likely worth between $190,000 and $590,000 on the day it was created; if one discounts at 8%, that worth jumps to a range of $200,000 to $730,000. These values only increase if one adds in the prospect of payment of the principal, or computes some nonzero probability of that payment being accelerated by Kimberly's need to qualify for Medicaid. (They also admittedly decrease with the probability that Kimberly would use the money before then.) This means that the allocation approved by the Probate Court is not simply an allocation of $1 million to Kimberly. As the Hickses suggest, there was a real risk that Clyde would predecease Kimberly. If he did, the present value of the note would become part of his taxable estate, and these rough calculations strongly hint that that value would not be negligible.

This strongly suggests that there was real economic substance here even if we look at the entirety of the allocation, including the loan. We do agree with the Commissioner that it's reasonable to assume that Kimberly's injuries would shorten her life, but we find as a fact she was in no danger of imminent death at the time of the settlement, and so do not see the loan

---

[7] Federal Reserve Statistical Release H.15, Selected Interest Rates, Historical Data, http://www.federalreserve.gov/ releases/h15/data.htm.

as an attempt to dodge the imminent imposition of the estate tax. Cf. Robinson, 102 T.C. at 129 (even State-court-approved allocations are disregarded if done "solely with a view to Federal income taxes").

We also find that Clyde had plenty of motivation to seek a large portion of the settlement for himself. Remember that under Ohio law parents have a statutory obligation to provide continuing support to their minor children. Ohio Rev. Code Ann. sec. 3103.03(A) (Anderson 2003). And medical care for Kimberly was expected to cost around $30,000 a month. Given Clyde's obligation to support Kimberly until she was an adult, and in the face of Kimberly's enormously expensive round-the-clock care, it seems quite reasonable for Clyde to have sought a large payout and then to have provided part of it as a loan to a trust to ensure money would be available. The allocation-plus-loan of $1 million can be seen as fulfillment of the parental duty that he owed his daughter. Should the Hicks lose their health insurance, or if Kimberly turned out not to qualify for Medicaid coverage, the trusts and the Hickses would shoulder the financial burden. But the Hickses' lawyers foresaw a sea of troubles if that happened. If there was too much money in the Management Trust, Medicaid might swallow it all before Kimberly would become eligible; but if too much money went to Clyde, it might end up with unforeseen future creditors of his own if he met with bad

luck. The loan was a way to tack between these two dangers. It ensured that the money would be there during Kimberly's minority, but with a towline attached so that if Kimberly were ever forced to rely on Medicaid, the money could be taken out of the Management Trust and she could qualify after spending down only $450,000 rather than nearly $1.5 million. Her parents would then have the resources from which they could continue to meet her needs that were unmet by Medicaid.

In deciding whether the allocation as a whole lacked substance, we return again to the important role of the Probate Court under Ohio law. Probate courts' decisions in this area are discretionary--as the Hickses' personal injury lawyer credibly testified: "Some judges don't like special-needs trusts, because some judges think that that money should go to the state, and that's just a strong philosophical belief. Some judges don't mind the loss-of-society claims; some judges do." And unless there is an abuse of discretion, an Ohio appellate court "will not substitute its judgment for that of the trial court." In re Estate of Steigerwald, 2004-Ohio-3834, at par. 17 (Ohio Ct. App. 2004) (discussing allocation of wrongful death suit). Ohio is, moreover, wonderfully blunt about why it gives Probate Courts this degree of deference: to "protect minors against others whose interests may be adverse to theirs, *especially their parents.*" In re Guardianship of Matyaszek, 824 N.E.2d 132, 143 n.7 (Ohio

Ct. App. 2004) (emphasis added). This makes us especially disinclined to second-guess, in the guise of economic-substance review, their specialized expertise in the appropriate allocation under Ohio family law of the lump-sum settlement of a state tort claim.

In upholding the allocation of the settlement made by the State court in this case as having economic substance, we are not invoking a bright-line rule that our Court must always defer to settlement allocations reviewed by State courts--we plainly don't in circumstances like those we faced in Robinson, where a state-court judge late one night accepted a settlement that grossly rewrote a jury's allocation in a way plainly aimed at reducing the taxability of the award. In a case like that, there is no incentive by the state-court judge to closely review the settlement--as we pointed out there, since Texas has no income tax of its own, there was no state interest that would be affected by a different allocation.

The Hickses' case--though superficially similar in that the settling tortfeasor had no interest in the allocation of the settlement--is different in important ways. The first, of course, is that states themselves have an interest (represented by state-court judges) in considering the impact of allocations in personal injury cases on the state's own Medicaid system. The field of long-term health-care planning, both for the disabled

and the elderly, is rapidly growing and changing with a frequency that seems to rival tax law's. The policy decisions already made by Congress and the states in that area--acknowledging the use of trusts and asset transfers in preparing to qualify for Medicaid benefits, but limiting them and, in cases like this, subjecting them to state-court review--strongly counsel us to not second-guess those courts in the guise of reallocating settlements years later in estate-tax cases.

A second factor making us reluctant to upset the allocation here is that the initial allocation of the settlement was not between taxable and nontaxable amounts. Unlike Robinson, the allocation here was entirely among various causes of action all of which produced nontaxable transfers to the Hickses. That reduces the probability that tax avoidance was driving the allocation--to be sure, there would be foreseeable tax consequences, but those consequences depended on questions that couldn't be answered with much certainty: Would Clyde and Theresa die before Kimberly? How much money would the trusts have to spend on her? Would the Blue Cross/Blue Shield insurance lapse sooner or later or not at all?

And we finally return to Ohio's law expressly giving probate courts the authority to review intrafamily allocations of tort settlements when minors are involved. This reflects the all-too-human likelihood that not all families will respond to the type

of tragedy that the Hickses endured the way the Hickses endured it, by drawing together to do the best for all the members of the family. Some families will be rent asunder in dividing large amounts of money, and some parents will inevitably be tempted to cheat their own children. But Ohio foresaw that threat and created courts to forestall it. Due regard for them again counsels us against upsetting the allocation of the settlement here.

Our hesitation echoes the Supreme Court's, which recently noted the potential importance of State-court approval in similar circumstances. Ark. Dept. of Health & Human Servs. v. Ahlborn, 547 U.S. 268, 126 S. Ct. 1752, 1765 (2006). Ahlborn involved a statutory lien that Arkansas imposed on settlement proceeds received by accident victims. The lien's purpose was to reimburse the State for its Medicaid expenses in caring for the victim, but the lien was limited to "medical expenses" that were recovered. Arkansas wanted to extend the lien to the entire amount of any settlement proceeds, suspecting that the parties' allocation of the settlement among various categories of damage was done with an eye to minimizing the reach of the lien.

To be sure, Ahlborn is not directly on point either, because the Supreme Court did not actually rule on the argument that court approval should shield an allocation from subsequent second-guessing. But it did hint strongly in that direction:

> [T]he risk that parties to a tort suit will allocate away the State's interest can be avoided either by obtaining the State's advance agreement to an allocation or, if necessary, *by submitting the matter to a court for decision.*

Id. at ___, 126 S. Ct. at 1765 & n.17 (emphasis added).

We view with some skepticism the Commissioner's fear that upholding the deductibility of the loan repayment here will trigger a massive recharacterization of settlement proceeds as intrafamily loans in the future.  But we take cases one at a time, and here the facts persuade us that Clyde's loan had real substance--it was concededly valid under Ohio law, and resulted in the creation of real interest income on which he really did pay tax.  We are particularly persuaded by the evidence that the Hickses were trying very hard to comply with the complex Medicaid-eligibility rules in settling the trusts.  As the Supreme Court said in a leading opinion on substance-over-form,

> where, as here, there is a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached, the Government should honor the allocation of rights and duties effectuated by the parties * * *.

Frank Lyon Co. v. United States, 435 U.S. 561, 583-84 (1978).

We therefore honor the allocation disputed here, and find that the $1 million loan was *bona fide* and for adequate and full

consideration under section 2053(c)(1)(A).  It is not a sham, and we hold that it is deductible from Kimberly's gross estate.[8]

II.  Administrative expenses

The Commissioner has conceded in his posttrial brief the deductibility of administrative expenses incurred by the trusts in 2000, but contests all later expenses.  The problem for the estate is that it neither secured the admission of a summary exhibit--Exhibit 120-P--nor elicited testimony from the Key Bank employee who testified about the estate's fees and expenses after Kimberly died.  That leaves those expenses unsubstantiated for the years 2001-2004, and so we must disallow them.  The estate is quite right, however, about the expenses of this litigation; those expenses are governed by Rule 156:

> If the parties in an estate tax case are unable to agree under Rule 155 * * * upon a deduction involving expenses incurred *at or after the trial*, then any party may move to reopen the case for further trial on that issue.  [Emphasis added.]

The parties are encouraged to reach a settlement on this issue, but in any event

Decision will be entered under Rule 155.

---

[8] Any predeath interest accrued under the terms of the promissory note follows the loan (i.e., is payable to Clyde as the holder of the note) and thus is also deductible by the estate.  See sec. 20.2053-4, Estate Tax Regs.